**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 23-1723 and 23-1724

_____

LEE EVANS

v.

NEWARK CITY; FORMER MAYOR, COREY A.
BOOKER; OFFICER JOE HADLEY; DETECTIVE
RASHID SABUR; DETECTIVE KEITH SHEPPARD; SGT.
DARNELL HENRY; DETECTIVE JOSEPH HADLEY;
OFFICER ANGEL RAMOS; NEWARK POLICE OFFICER
JOHN DOE (1-10) FORMER, NEWARK POLICE
DIRECTOR GARRY MCCARTHY; ESSEX COUNTY
PROSECUTORS OFFICE; ROBERT D. LAURINO, former
acting Essex County Prosecutor; ASSISTANT
PROSECUTOR PETER GUARINO; ASSISTANT
PROSECUTOR CHERYL M. CUCINELLO; DETECTIVE
CHRISTOPHER SMITH; LIEUTENANT LOU CARREGA;
AGENT JACK EUTSEY; DETECTIVE MICHAEL M.
RECKENWALD; INVESTIGATOR EDWARD JONES;
INVESTIGATOR PATRICK DEFRANCISCI; DETECTIVE
SGT. WILLIAM TIETJEN; NEW JERSEY STATE
TROOPER (1-10)

Lou Carrega,
Appellant in No. 23-1723

William Tietjen,
Appellant in No. 23-1724

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2:14-cv-00120)

District Judge: Honorable Kevin McNulty

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
May 24, 2024

Before: RESTREPO, FREEMAN and McKEE, *Circuit
Judges*

(Filed: September 12, 2025)

Jennifer A. Bonjean
BONJEAN LAW GROUP
233 Broadway
Suite 707
New York, NY 10279
      *Counsel for Appellee*

James A. Kassis
SCHENCK PRICE SMITH & KING
220 Park Avenue
P.O. Box 991
Florham Park, NJ 07932

Elizabeth Micheletti
Jae K. Shim
OFFICE OF ATTORNEY GENERAL OF NEW JERSEY
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08611

Andrew D. Spevack, Esq.
OFFICE OF ATTORNEY GENERAL OF NEW JERSEY
Department of Law & Public Safety
Claims Section
Richard J. Hughes Justice Complex
Trenton, NJ 08625

Michael Vomacka
OFFICE OF ATTORNEY GENERAL OF NEW JERSEY
5th Floor
124 Halsey Street
5th Floor
Newark, NJ 07102
          *Counsel for Appellant in No. 23-1723*

Patrick J. Misale
Michael Vomacka
OFFICE OF ATTORNEY GENERAL OF NEW JERSEY
5th Floor
124 Halsey Street
5th Floor
Newark, NJ 07102
          *Counsel for Appellant in No. 23-1724*

---

**OPINION OF THE COURT**

---

RESTREPO, *Circuit Judge.*

In 1978, five teenage boys from Newark, New Jersey disappeared. The case remained unsolved for 30 years. Then, in 2008 police charged Appellee Lee Evans with their murders. The case against Evans relied on the allegedly coerced confession of one man, who was coached by Appellants to implicate Evans. A jury acquitted Evans of all charges, and he later brought claims for malicious prosecution. Detectives Lou Carrega and William Tietjen (collectively "Appellants") now argue that they are entitled to qualified immunity.[1]

But the doctrine of qualified immunity does not shield a malicious prosecution claim where evidence is allegedly manufactured. It is always unconstitutional for the police to coerce confessions and manufacture evidence to prosecute a criminal suspect. We will therefore affirm the District Court's order denying summary judgment to Appellants.

---

[1] An additional Defendant in the underlying action, Detective Joseph Hadley, has made several filings in this appeal, but is not a proper party to this appeal, so our resolution of this appeal does not affect the decision of the District Court as it applies to him.

## I.    FACTUAL BACKGROUND[2]

The events that led to this appeal began over 45 years ago, when five male teenagers[3] disappeared in Newark on August 20, 1978.  The remains of the teens were never found.  Their presumed deaths and the resulting lack of closure afforded to their families is a tragedy.

### A.  INITIAL INVESTIGATION & COLD-CASE INVESTIGATION

Following the teens' disappearance, detectives from the Newark Police Department ("NPD") began a missing persons investigation.  Detectives interviewed family members and other individuals from the community, including Appellee Lee Evans and his second cousin, Philander Hampton – a key player in this story.

That investigation produced a report, containing witness accounts and the initial interviews of Evans and Hampton.  Evans allegedly reported that the teens did construction work with him on the day of their disappearance, although Hampton

---

[2] The facts are limited to those that are relevant and material to this appeal.  "In interlocutory appeals from denials of summary judgment on the basis of qualified immunity, we must accept the District Court's set of facts as given."  *Walker v. Horn*, 286 F.3d 705, 707 (3d Cir. 2002).  Therefore, we have drawn these facts from the opinion of the District Court.  *See Evans v. City of Newark*, Civ. No. 14-00120, 2023 WL 2535283 (D.N.J. Mar. 16, 2023).

[3] The names of the five young men, all aged 16 and 17 and now presumed dead, were Randy Johnson, Ernest Taylor, Melvin Pittman, Alvin Turner, and Michael McDowell.

provided conflicting information. Evans has since denied the details of this interview. Despite hundreds of interviews, the investigation remained stagnant, and investigators were unable to even determine if a homicide had occurred.

For the following two decades, the murders remained a mystery. In 1998, however, the NPD assigned detectives from its Homicide Cold Case Unit to investigate. In February 1999, the cold-case investigators interviewed Hampton for a second time. According to their report, Hampton again denied knowledge of or involvement with the disappearance, and stated "If I confess to this shit, my life is over."[4] At his deposition in the civil case underlying this appeal, taken in 2022, Hampton stated that he neither recalled giving this interview, nor making that statement.

The cold-case investigators also re-interviewed Evans. According to that report, investigators told Evans that they were aware that the missing boys had stolen marijuana from him prior to their disappearance. The report states that Evans responded to this information by claiming that the "situation was bigger than him" and "he was only a middleman."[5] Evans has since denied making those statements.

## B. APPELLANTS' INVESTIGATION AND THE ALLEGEDLY COERCED CONFESSION

After nearly 29 years of little to no progress on the case, the Essex County Prosecutor's Office ("ECPO") opened its own independent investigation in 2007, which was led by Detective Carrega. In May 2008, Detective Tietjen of the New

---

[4] App. 14.
[5] *Id.*

Jersey State Police ("NJSP") joined Carrega's team.[6]  Early in this investigation, Carrega and his team re-interviewed many of the same people that had previously been interviewed in both the initial investigation and the 1998 cold-case investigation.  Based on the existing investigative record, Detectives Carrega and Tietjen viewed Evans as a suspect in the disappearance.

In November 2008, an opportunity to re-interview Hampton materialized when, according to the Appellants' account, Detective Carrega learned that Hampton was in custody at the Essex County Jail on a traffic warrant and had him transported to the ECPO.  The events that followed are hotly disputed and sit at the center of both this appeal and the civil action from which it stems.

According to the Appellants, Hampton initially reiterated his prior statements that he had no knowledge of the circumstances surrounding the teens' disappearance.  When prompted, he agreed to submit to a polygraph test, which the investigators subsequently informed him he had failed.  Upon being confronted with the purported polygraph failure, Appellants claim Hampton cracked, responding "OK, I guess it had to come out someday, I'll tell you what happened but you know it was [Evans] right?"[7]  Hampton then allegedly agreed to give a recorded statement.

Appellants then transported Hampton from the ECPO to the NJSP barracks in Newark.  According to the Appellants' version of events, while Hampton was en route to the NJSP barracks, he asked Detective Carrega if he wanted "to see

---

[6] Several other people worked on this investigation, but their identities are not relevant to the qualified immunity analysis at issue in this appeal.

[7] App. 17.

where the kids were killed[,]"[8] and subsequently directed Detective Carrega to the alleged crime scene on Camden Street.  Appellants claim Hampton explained that, prior to the boys' disappearance, he had lived on the third floor of a three-story house that had formerly stood at the location, and that the missing boys had been killed there.

According to Appellants, Hampton was subsequently taken to the NJSP barracks, where he provided a video-recorded statement in which he identified Evans as the killer and confessed to helping him.  In his statement, Hampton explained that he and Evans, along with another family member, rounded up the teens in Evans's pickup truck and brought them to the house.  Evans then forced them into a closet and nailed the door shut, before dousing the house in gasoline and setting it on fire with a single match.  Hampton and Evans left through the back of the house, and Evans drove Hampton home as the house burned down.

Evans provides a flatly contradictory account of Hampton's November 2008 interview, alleging in his civil complaint that Carrega and Tietjen coerced Hampton into parroting a false confession that the detectives themselves had fabricated.  The truth, according to Hampton's affidavit, is that Detective Carrega refused to accept Hampton's repeated denials of any knowledge or involvement.  To prove his honesty, Hampton agreed to take a polygraph test, but was informed that he had failed.  At this point, Detective Carrega became aggressive, telling Hampton that if he did not implicate Evans, he would be charged himself.  After extended questioning and under substantial pressure from the Appellants, Hampton agreed to repeat their story—that the

---

[8] *Id.*

8

boys had died in a fire set by Evans—but made clear to the detectives that it was a lie.

During the transport to the NJSP barracks to record the statement, Detective Carrega coached Hampton on the story he was to repeat on camera, explaining exactly which questions he would be asked, and how he was to answer them. Detective Carrega, not Hampton, navigated to the Camden Street address and explained how that location fit into the concocted narrative. Hampton eventually recorded the allegedly coerced confession at the NJSP barracks, framing Evans for the murders.

### C. CRIMINAL PROCEEDINGS AGAINST HAMPTON AND EVANS

With Hampton's statement secured, Appellants attended a March 2010 meeting with prosecutors to discuss criminal charges. Prosecutors ultimately made the decision to file charges against Hampton and Evans, with both Appellants contributing to that decision. Detective Carrega signed an affidavit of probable cause in support of arrest warrants for Hampton and Evans. Both men were arrested.

Hampton reached a plea agreement, which required him to plead guilty to five counts of felony murder and to testify against Evans at trial, in exchange for a favorable sentence. Prior to entering his plea, Hampton moved to suppress his confession on the grounds that it was taken in violation of *Miranda v. Arizona*,[9] but that motion was denied. Hampton nevertheless reiterated the same facts contained in the controverted recorded statement in support of his guilty plea.

In October 2011, Evans was tried for the murder of the five missing teens. Hampton served as the State's star witness,

---

[9] 384 U.S. 436 (1966).

testifying for two days and telling the same story from the allegedly coerced confession.  Despite Hampton's testimony, Evans was acquitted on all counts by the jury on November 23, 2011.

### D.  EVANS'S CIVIL LAWSUIT AND HAMPTON'S RECANTATION

Two years later, on November 21, 2013, Evans filed the civil lawsuit from which this appeal originates.  Several claims survived motions to dismiss, including the claims of malicious prosecution against the Appellants that are at issue here.

On June 6, 2017, Hampton recanted his accusations against Evans, attesting in a notarized statement that his November 2008 recorded statement was fabricated and coerced, and identifying both of the Appellants as participants in the fraud.  Later, on October 27, 2020, Hampton signed a sworn affidavit, which detailed the allegedly coerced confession from November 2008 that now forms the basis of Evans's claims against the Appellants.

## II.   PROCEDURAL HISTORY

Appellants filed motions for summary judgment seeking dismissal of all claims against them in August 2022. As to the malicious prosecution claims, Detectives Carrega and Tietjen argued that they should be granted summary judgment because they were entitled to qualified immunity.

The District Court entered an opinion and order granting in part, and denying in part, Appellants' motions.  As relevant here, the Court held that Appellants are not entitled to qualified immunity on the malicious prosecution claims. Appellants filed a timely interlocutory appeal, challenging the qualified immunity ruling.

### III. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291 over the denial of summary judgment on the basis of qualified immunity pursuant to the collateral order doctrine, but only "to the extent that it turns on an issue of law."[10] Although we lack jurisdiction to review factual disputes,[11] such as the veracity of Hampton's allegedly coerced confession, we review all questions of law de novo,[12] including the presence or absence of probable cause.[13]

We view all facts and inferences in the light most favorable to Evans and will reverse the District Court's denial of summary judgment only if "there is no genuine dispute as to

---

[10] *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *see also Mack v. Yost*, 968 F.3d 311, 318 (3d Cir. 2020) (quoting *Mitchell*, 472 U.S. at 530).

[11] *See Johnson v. Jones*, 515 U.S. 304, 319–20 (1995) (holding a defendant asserting qualified immunity may not appeal a summary judgment determination as to the existence of disputed factual issues).

[12] *See Pinkney v. Meadville, Pa.*, 95 F.4th 743, 747 (3d Cir. 2024) (citing *Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*, 971 F.3d 416, 424 (3d Cir. 2020)).

[13] *See Wright v. City of Phila.*, 409 F.3d 595, 599 (3d Cir. 2005), *abrogated on other grounds by Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024) (concluding that, in an interlocutory appeal from a qualified immunity ruling, we have jurisdiction over "the purely legal question of whether the facts alleged, even in the light most favorable to [the plaintiff], were legally sufficient to establish probable cause").

any material fact [and] the [Appellants are] entitled to judgment as a matter of law."[14]

## IV.   DISCUSSION

Qualified immunity shields government officials, including law enforcement, from liability unless their conduct violates a clearly established right.[15] When assessing qualified immunity, our inquiry is two-fold: "(1) whether the plaintiff sufficiently alleged a right had been violated, and (2) whether that right was clearly established when it was allegedly violated to the extent 'that it would have been clear to a reasonable person that his [or her] conduct was unlawful.'"[16] The "clearly established" test ensures that government officials are not liable unless they had reasonable notice that their conduct would be considered unlawful.[17]   At issue here is

---

[14] Fed. R. Civ. P. 56(a); *cf. Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[15] *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021).

[16] *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Williams v. Sec'y Pa. Dep't of Corrs.*, 848 F.3d 549, 557 (3d Cir. 2017)).

[17] *See e.g.*, *Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts . . . If the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense."); *Davis v.*

Evans's constitutional right to be free from arrest and prosecution without probable cause, where probable cause was created by manufactured evidence.

### A. A REASONABLE JURY COULD FIND APPELLANTS LACKED PROBABLE CAUSE TO ARREST EVANS – VIOLATING HIS CONSTITUTIONAL RIGHTS

Appellants arrested and prosecuted Evans based on Hampton's allegedly coerced confession. The District Court denied summary judgment after determining that "a reasonable jury could find that [Appellants] made a reckless, material omission that led to the initiation of criminal proceedings against Evans without probable cause, and that the element of malice [wa]s met."[18] We agree and therefore affirm the District Court's determination that a jury could find Appellants violated Evans's constitutional rights.

Despite our clear precedent,[19] we feel obligated to reiterate our duty to dissect a potentially tainted affidavit of probable cause. "[W]hen, as here, a judge issues an arrest warrant, we defer to it unless the officer misrepresented

---

*Scherer*, 468 U.S. 183, 195 (1984) ("The qualified immunity doctrine recognizes that officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages . . ."); *Harlow*, 457 U.S. at 818 ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.").

[18] App. 44.

[19] *Pinkney*, 95 F.4th at 748.

material information to get the warrant."[20]    In this case, a reasonable jury could find that Appellants made a reckless and material omission when they failed to disclose that Hampton's confession was coerced.  We must determine if a reasonable jury could find that omission was (1) made "knowingly and deliberately, or with a reckless disregard for the truth" and (2) "material, or necessary, to the finding of probable cause[.]"[21]

The affidavit drafted by Detective Carrega contained the following paragraph with respect to Hampton's confession:

> On November 13, 2008, Philander Hampton was interviewed by Lt. Louis Carrega, ECPO, Det. Joseph Hadley, NPD and Det. Trooper William Tietjen, NJSP.  Hampton stated to officers that he resided on the third floor of 256 Camden Street aforesaid and that he moved out on Saturday, August 19, 1978.  Hampton stated that he participated in the murder of the five missing boys and that he was assisting his cousin Lee Evans, who he knew wanted to kill the boys. Philander Hampton stated that he held two of the boys at gun point at 256 Camden Street while Lee Evans rounded up the other three boys. Hampton stated that the five boys were then put in a closet, the closet was nailed shut and the room was doused with gasoline.  Lee Evans lit the house on fire.  Hampton further stated that he

---

[20] *Id.* (citing *Andrews v. Scuilli*, 853 F.3d 690, 697–98 (3d Cir. 2017)).

[21] *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997).

and Lee Evans ran out from the back of the house.[22]

If a jury credits Hampton's recantation, it follows that the affidavit omitted two important facts: (1) Hampton repeatedly denied any knowledge or involvement in the murders; and (2) Hampton made it clear that Appellants' fabricated story was a lie. Without question, these omissions are "the kind of thing [a] judge would wish to know."[23]   Not only did Appellant Carrega omit these facts from the affidavit, but both Appellants, who were present during the alleged confession and Hampton's repeated denials, failed to disclose these facts at the charging meeting held with prosecutors.[24]   Appellants were "not free to disregard plainly exculpatory evidence."[25]  So a reasonable jury could find not only that these omissions were made with reckless disregard for the truth, but "also . . . that the [Appellants] acted with malice."[26]

---

[22] App. 41.

[23] *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).

[24] App. 1811 (At his deposition for the underlying civil lawsuit, prosecutor Laurino testified:

> Q: At the time the charges were sought and through the trial of Lee Evans, were you aware of any allegations that the statement of Philander Hampton was coerced?
> A: No. I [was] unaware of any coercion regarding Mr. Hampton's statement.)

[25] *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 469 (3d Cir. 2016) (internal citations omitted).

[26] App. 43.

To determine if these omissions were material, we "insert the facts recklessly omitted"[27] into the suspect affidavit and reconsider if the revised affidavit would be sufficient "to warrant a reasonable person to believe"[28] that Hampton and Evans committed the murders. The inclusion of an involuntary, coerced confession is material. Not only would a reasonable person have doubts, but the charging prosecutors in this case later admitted that without Hampton's confession, probable cause did not exist.[29] Thus, because a reasonable jury could find that these omissions tainted the probable cause finding, we affirm the District Court's determination that the evidence in the record fails to clearly establish probable cause for Evans's arrest and prosecution.[30]

## B. NO REASONABLE OFFICER WOULD HAVE ARRESTED AND PROSECUTED EVANS

Viewing the facts in the light most favorable to Evans, Appellants violated Evans's constitutional right by arresting and prosecuting him without probable cause. Existing caselaw clearly establishes and recognizes that right.[31] But Appellants

---

[27] *Wilson*, 212 F.3d at 789.

[28] *Id.* (internal quotation marks omitted).

[29] *See, e.g.*, App. 1818 ("Without the statement, there surely would not have been probable cause to arrest. Can we agree on that? [] Yes. I agree with that.").

[30] *See* App. 43–44.

[31] *See, e.g.*, *Andrews*, 853 F.3d at 705 (quoting *Orsatti v. N. J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995) ("There is no question that the right . . . to be free from arrest except on probable cause [is] clearly established.")); *Kelly v. Borough of Carlisle*, 622 F.3d 248, 256 (3d Cir. 2010) (citing *Berg v. Cnty.*

argue that they are entitled to qualified immunity so long as there was probable cause, without Hampton's confession, to arrest and prosecute Evans. They ignore their blatant omissions and describe the allegedly coerced confession as "a red herring for purposes of the qualified immunity analysis."[32]

Appellants argue in substance that as long as probable cause exists for an arrest, they must be afforded qualified immunity for their conduct during any subsequent prosecution. However, merely stating that principle establishes its absurdity. Taken to its logical conclusion, this implies that police have a license to use whatever means they choose to prosecute any criminal suspect they have probable cause to arrest, including coercing confessions and manufacturing evidence, in order to secure a conviction.

That is not correct. "We emphatically reject the notion that due process of law permits the police to frame suspects" or "cook[] up its own evidence."[33] It should be painfully obvious that such conduct is blatantly unconstitutional whether or not the initial arrest of the suspect was consistent with the guarantees of the Fourth Amendment. Procedural due process "protects defendants during an entire criminal proceeding through and after trial," and that includes a protection from the use of fabricated evidence.[34] We held in *Halsey*, "if a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment

---

*of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000)) ("[I]t [is] clearly established that an arrest could be made only on the basis of probable cause.").

[32] Appellants' Br. 19–20.

[33] *Halsey v. Pfeiffer*, 750 F.3d 273, 293 (3d Cir. 2014).

[34] *Id.* at 291.

if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted."[35]

Here, fortunately, we are not confronted with potentially fabricated evidence resulting in conviction and incarceration. Evans was acquitted. He was nevertheless subjected to a criminal prosecution and forced to stand trial based upon evidence that a reasonable jury could find was cooked up by law enforcement.[36] Although that acquittal certainly may be relevant to assessing damages, we cannot conclude that it would absolve these Appellants from liability for their allegedly unconstitutional conduct.[37] Indeed, we previously

---

[35] *Id.* at 294.

[36] *See id.* at 289 ("When falsified evidence is used as a basis to initiate the prosecution of a defendant, or is used to convict him, the defendant has been injured regardless of whether the totality of the evidence, excluding the fabricated evidence, would have given the state actor a probable cause defense in a malicious prosecution action that a defendant later brought against him.").

[37] The plaintiff in *Halsey* was convicted and served a prison term based (at least in part) on fabricated evidence. In denying a claim of qualified immunity, we stated that "we [did not] decide whether a defendant acquitted at a trial where fabricated evidence has been used against him has an actionable section 1983 claim. We note[d], however, that if fabricated evidence is used as a basis for a criminal charge that would not have been filed without its use the defendant certainly has suffered an injury." *Id.* at 294 n.19. We were careful to clarify that we "[were] not suggesting that there is nothing wrong with the fabricating of evidence if it does not affect the final verdict." *Id.* at 295 n.20.

18

have made clear that such conduct can be actionable even when trial results in an acquittal.[38]

The fact that the allegedly coerced confession was used leading up to and at trial distinguishes Evans's case from other malicious prosecution cases that we have resolved on probable cause alone.  For example, we held that the plaintiff in *Zimmerman v. Corbett* had no claim for malicious prosecution because undisputed evidence established probable cause.[39] But the government dropped the charges against Zimmerman before any trial,[40] so his claim primarily implicated the Fourth Amendment's guarantee against unlawful pretrial seizure. Moreover, there was nothing in *Zimmerman* to suggest that any alleged manufacturing of evidence infected the proceeding beyond the initial filing of charges.  Here, by contrast, Evans's allegations implicate his due process rights at trial.[41]  This bears on Evans's § 1983 claim for malicious prosecution because, as we repeatedly have noted, Fourth and Fourteenth Amendment injuries are intertwined where the alleged misconduct "infected the entirety of the criminal proceeding, from securing the indictment through trial."[42]

---

[38] *Black v. Montgomery Cnty.*, 835 F.3d 358, 372 (3d Cir. 2016).

[39] 873 F.3d 414, 418–19 (3d Cir. 2017).

[40] *Id.* at 417.

[41] *See Halsey*, 750 F.3d at 291 ("The initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause." (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1285–86 (10th Cir. 2004))).

[42] *Black*, 835 F.3d at 369 n.11; *see also Halsey*, 750 F.3d at 291.

We also reject Appellants' theory that they should be granted qualified immunity because they acted on a "reasonabl[e] but mistaken[] conclu[sion] that [probable cause was present]."[43]     That principle is inapplicable here. Fabricating evidence to manufacture probable cause, as alleged here, eviscerates the possibility of a reasonable mistake.  "[N]o reasonable officer would have covered up a lack of probable cause by [fabricating evidence]."[44]

## C.

In addition to the malicious prosecution claim at issue here, Evans's operative complaint included a § 1983 claim based on "Fabrication of Inculpatory Evidence."  In 2016, the District Court held that aspects of Evans's § 1983 claim were untimely, explaining Evans's injuries would have been "apparent by the time grand jury proceedings were completed," and that only malicious prosecution depended on the outcome of the criminal proceeding.[45]  This analysis referred to "abuse of process . . . [and] related theories," but did not specifically address fabrication of evidence.[46]  To the extent Evans asserts injury for the use of the fabricated evidence in his trial, it makes little sense for that injury to have accrued prior to the commencement of trial.  In addition, Hampton's declaration stating that the confession had been fabricated did not materialize until 2017 — a year after the District Court's timeliness ruling, and four years after Evans filed his initial

---

[43] *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

[44] *Pinkney*, 95 F.4th at 750.

[45] *Evans v. City of Newark*, No. 14-00120, 2016 WL 2742862, at *4–6 (D.N.J. May 10, 2016).

[46] *Id.* at *4.

Complaint asserting fabrication of evidence. Hampton's recantation was not before the District Court when it ruled on timeliness, but it may impact when Evans was on notice of the allegedly coerced nature of the confession. On remand, the District Court should address whether Evans still has a timely § 1983 claim for fabrication of evidence.

## V.    CONCLUSION

For the foregoing reasons, we will affirm the order of the District Court denying summary judgment to Detectives Carrega and Tietjen on the claim for malicious prosecution, but remand for reconsideration of the § 1983 claim for fabrication of evidence. The doctrine of qualified immunity does not properly shield malicious prosecution claims where evidence is manufactured against a person.